## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| RESONANT SYSTEMS, INC. d/b/a, RevelHMI, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CASE NO. 2:22-CV-00423-JRG |
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., | § § § § | |
| *Defendants*. | § § | |

## CLAIM CONSTRUCTION ORDER

Resonant Systems, Inc., asserts patent infringement by Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. (together, "Samsung") of claims from U.S. Patent Nos. 9,369,081 and 9,941,830. The patents, which are related and share a common specification,[1] concern "vibration modules" used in electromechanical devices such as pagers, electric toothbrushes, and game controllers. *See* '081 Patent at 1:15–20, 1: 24–30.

The parties present nine disputes about claim scope. Having considered the parties' briefing and arguments of counsel during a June 2, 2025 hearing, the Court resolves the disputes as follows.

## I.    BACKGROUND

### A.    The Patents

The patents purport to teach a better way of producing vibrations than by using intentionally unbalanced electric motors. Prior-art methods rotate a shaft to which a weight is

---

[1] *See* '830 Patent at [63] (identifying the '081 Patent as related).

asymmetrically mounted, which causes the end of the shaft to move elliptically. The amount of vibration varies with the speed of rotation. *See generally* '081 Patent at 1:30–2:11.

The patent describes two main problems with this approach. First, this method "produces destructive, unbalanced forces within the motor that contribute to rapid deterioration of motor parts." '081 Patent at 2:18–20. Second, this method is "relatively inefficient." *See id.* at 2:32–32, 2:59–63 (noting "[t]he bulk of energy consumed by an unbalanced electric motor is used to spin the shaft and unbalanced weight and to overcome frictional and inertial forces within the motor," so "[o]nly a relatively small portion of the consumed energy is translated into desired vibrational forces"). In addition, many applications are better suited for linear oscillation rather than the elliptical oscillation of the prior art. *Id.* at 2:40–46.

To address these deficiencies, the patents teach a vibration module that uses linear oscillation of a mass rather than elliptical oscillation of a shaft and weight. As shown in Figures 4A–4G (below), which illustrate an embodiment of a vibration module in various states, a cylindrical housing (402) defines a chamber (406) in which a cylindrical magnetic weight (404) can move linearly. The chamber has a magnetic disk (414, 416) on each end. Each disk has the same polarity as the closest end of the weight. A coil (420) encircles the housing, and applying an electric current (422, 430) to the coil creates a corresponding magnetic force (424, 432) that accelerates the weight one way or the other. When the weight reaches one side, a repulsive magnetic force due to the closest disk and the weight having the same polarity decelerates the weight and reverses its direction. The module then applies current to the coil in the opposite direction, which helps move the weight to the other end of the chamber, and the process repeats. Thus, a rapidly reversing polarity of the magnetic field, combined with the repulsive forces between the weight and the disks, causes the weight to linearly oscillate between the ends of the chamber. *See generally* '081 Patent at 4:44–

5:34.



FIG. 4A

FIG. 4B

FIG. 4C

FIG. 4D

FIG. 4E

FIG. 4F

FIG. 4G

**FIGS, 4A–4G of the patents, which show the weight (404) in the center of the chamber (406) (FIG. 4A), the flow of current (422) in a coil (420) in a first direction (FIG. 4B) to create a magnetic force (424) in the direction of one magnetic disk (414), and the reversal of current (430) to create a magnetic force (432) toward the other magnetic disk (426) (FIG. 4C–4D).**

The independent claims of the two patents are very similar. For example, as shown in Table 1 (below), Claim 1 of each patent is directed to a "vibration module" with a housing, a moveable component, user-input features, a driving component, and a control component:

| TABLE 1 | |
|---|---|
| **'830 Patent, Claim 1** | **'081 Patent, Claim 1** |
| A vibration module comprising: | A linear vibration module comprising: |
| a housing; | |
| a moveable component; | |
| a power supply; | |
| user-input features; | |
| a driving component that drives the moveable component to oscillate within the housing; and | a driving component that drives the moveable component in each of two opposite directions within the housing; and |
| a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values. | a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features. |

The parties present nine disputes about claim scope. First, they dispute the scope of "vibration module" in the preamble, which the parties agree is limiting. Most of the other disputes relate to 35 U.S.C. § 112 ¶ 6 and the corresponding structure for those terms. And regarding Claim 4 of each patent, the parties dispute whether judicial correction of the claims' dependency is appropriate.

**B.    Related Proceedings**

These patents have been litigated before, both in this Court and in the United States District Court for the Western District of Texas. Both courts previously construed some of the terms now

at issue. *See* Cl. Constr. Order, *Resonant Sys., Inc. v. Sony Group Corp.*, No. 2:22-CV-00424-JRG-RSP, Dkt. No. 102-13; Cl. Constr. Mem. Op. & Order, *Resonant Sys., Inc. v. Apple, Inc.*, No. 7:23-CV-00077-ADA, Dkt. No. 102-14.

These patents have also survived *inter partes* review by the Patent Trial and Appeal Board. In January 2024, the PTAB instituted review of both patents. Decision Granting Institution ('081 Patent), Dkt. No. 71-1; Decision Granting Institution ('830 Patent). Two months later, the Court stayed this case pending final resolution of Samsung's IPR petitions. Mem. Op. & Order, Dkt. No. 83. In January 2025, the PTAB adjudged some claims from each patent invalid. *See* Final Written Decision (IPR2023-00992), Dkt. No. 102-8; Final Written Decision (IPR2023-00993), Dkt. No. 102-9. Shortly thereafter, the Court lifted the stay. Order Lifting Stay (Mar. 28, 2025), Dkt. No. 96.

Because of the stay and IPR proceedings, the claim-construction briefing includes six documents filed over the course of 17 months. For ease of reference, those documents are: (1) Resonant's Opening Brief, Dkt. No. 69; (2) Samsung's Responsive Brief, Dkt. No. 74, (3) Resonant's Reply Brief, Dkt. No. 79; (4) Resonant's Opening Supplemental Brief, Dkt. No. 99; (5) Samsung's Supplemental Responsive Brief, Dkt. No. 102; and (6) Resonant's Reply Brief, Dkt. No. 104.

## II.    LEGAL STANDARDS

### A.    Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52

F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips,* 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must

look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B.      Means-Plus-Function Claiming[2]

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112 ¶ 6 (pre-AIA); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Under 35 U.S.C. § 112 ¶ 6, a structure may be claimed as a "means . . . for performing a specified function," and an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). When it applies, § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347.

But § 112 ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means" or "step for" terms, and a rebuttable presumption it does *not* apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. These presumptions stand or fall according to whether one of ordinary skill in the art would understand the claim with the functional language to denote

---

[2] The patents have effective filing dates before the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3, 125 Stat. 284, 285-93 (2011). The Court therefore refers to the pre-AIA version of the statute.

sufficiently definite structure or acts for performing the function in the context of the entire specification. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (noting § 112 ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Masco Corp.*, 303 F.3d at 1326 (noting § 112 ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998) (noting § 112 ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

Construing a means-plus-function limitation involves multiple steps. Step 1 "is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[Step 2] is to determine the corresponding structure described in the specification and equivalents thereof. Structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (citations and quotations omitted). The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). But § 112 ¶ 6 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

"[S]tructure can be recited in various ways, including [by using] 'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a

description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2005)). For § 112 ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must usually include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In that case, the corresponding structure is not a general-purpose computer but rather the special-purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### C.    Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909.

"Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). And in the context of § 112 ¶ 6, "[t]he party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence." *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) (quoting *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1380–81 (Fed. Cir. 2001)).

### III.    THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is

presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, Resonant says a skilled artisan at the time of invention "would have had (1) a bachelor's degree in electrical engineering, mechanical engineering, or a comparable field of study, and (2) at least two years of professional experience with electro-mechanical control systems, or other similarly relevant industry experience." Dkt. No. 69 at 2 (citing Hooper Decl., Dkt. No. 69-4 ¶ 23). Samsung says a skilled artisan would have had "a bachelor's degree in electrical engineering, mechanical engineering, computer science, or a similar field and two years of experience related to electronic consumer product design," which is the level of skill adopted by the PTAB in a related IPR proceeding. Dkt. No. 102 at 1 (citing Final Written Decision (IPR2023-00992), Dkt. No. 102-8 at 16–17; Final Written Decision (IPR2023-00993), Dkt. No. 102-9 at 7). To the extent necessary to resolve the disputes, the Court will address any differences in the parties' characterizations of a skilled artisan *infra*.

## IV.  THE DISPUTED TERMS

### A.  "vibration module" ('081 Patent and '830 Patents, Claims 1–8, 17)

| Resonant's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning | "a vibration-generating device that can be incorporated in a wide variety of appliances, devices, and systems to provide vibrational forces" |

The parties dispute, as Samsung puts it, whether "a module is unbounded and can be

anything." Dkt. No. 102 at 2. Samsung says Resonant's infringement contentions effectively construe "vibration module" to include a phone that vibrates. *Id.* Instead, argues Samsung, the specifications' use of the term is consistent with dictionary definitions that define a "module" as part of a larger structure or system. *Id.* (citing *module*, Dictionary of Sci. & Tech., Dkt. No. 102-1 at 400 ("a part that together with other parts makes up another structure or system"; "a self-contained piece of hardware that can be connected with other modules to form a new system"); *module*, Wiley Elec. & Elecs. Eng'g Dictionary, Dkt. No. 102-2 at 480 ("A self-contained, and usually standardized, unit that performs one or more tasks, and which can be incorporated into a complete system. A module has defined performance characteristics, and can be disconnected and removed as a single unit, in addition to being replaced by an equivalent.")).

Resonant focuses on the lack of any lexicography for disclaimer for the term. Dkt. No. 69 at 3. Calling this a readily understood phrase that requires no construction, Resonant accuses Samsung of attempting to import limitations from the specification. Dkt. No. 104 at 2 (noting "the specification says that vibration modules 'can [but not must] be incorporated' into other devices").

The Court agrees with Samsung. The Abstracts describe the inventions generally as "vibration modules that can be *incorporated in* a wide variety of applications, devices, and systems to provide vibrational forces." '081 Patent at [57] (emphasis added); *see also* '830 Patent at [57]. The patents' description of the technical field is similar. *See* '081 Patent at 1:15–20 ("The current application is related to . . . vibration modules *that can be incorporated into* a wide variety of different types of electro-mechanical devices . . . ." (emphasis added)). And the Background section describes the invention against the backdrop of "vibration-inducing motors and mechanisms [that] have been used for many years in a wide variety of different consumer appliances, toys, and other devices and systems [like] pagers [and] vibration-driven appliances." *Id.* at 1:24–28. These

excerpts don't support Resonant's position that the module doesn't have to be incorporated into other devices or systems, but rather that the claimed device can be incorporated into *many different types* of devices and systems. In fact, the patent describes the improvement over the prior art relative to unbalanced electric motors "used for generating vibrations *in a wide variety of different devices.*" *Id.* at 1:34–35 (emphasis added). This shows the patents use the term "module" in accordance with the dictionary definitions proffered by Samsung.

Nor are Resonant's other arguments persuasive. Resonant stresses that Samsung has not shown lexicography or disclaimer, so the term should have its "plain and ordinary meaning," Dkt. No. 104 at 1, and the Court doesn't need to construe the term, Hr'g Tr., Dkt. No. 111 at 5:2–5. But Samsung doesn't rely on either lexicography or disclaimer. Instead, the dispute is over the ordinary meaning of "module," although Resonant does not articulate what it believes that meaning to be. If the parties dispute the ordinary meaning of the term, the Court must resolve that dispute.

Resonant also stresses the Court's construction in *Sony* of "plain and ordinary meaning," but that was a different dispute. In *Sony*, the defendants sought a construction of "vibrating device" as "a more understandable articulation of the meaning of 'vibration module.'" *Sony* Cl. Constr. Order, Dkt. No. 102-13 at 8. The Court rejected that position because the defendants failed to present a dispute over the scope of the term. *Id.* at 9 ("[E]ven if, as Sony alleges, 'device' is *more* understandable by a jury than "module," that does not mean "module" is not *sufficiently* understandable."). There was no dispute about whether the "vibration module" must be incorporable into other devices or systems.

Here, however, Samsung has shown the ordinary meaning of the term requires that capability. Accordingly, the Court construes "vibration module" as "a device that can be incorporated into other devices or systems to provide vibrational forces."

### B.    Claim 4's Dependency ('081 and '830 Patents, Claim 4)

| Resonant's Construction | Samsung's Construction |
|---|---|
| "claim 3"; not indefinite | Plain and ordinary meaning |

This is an antecedent-basis dispute that implicates Claims 1, 3, and 4 of each patent.

Claim 1 of the '081 Patent recites:

> 1.    A linear vibration module comprising:
>
>    . . .
>
>    a control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features.

'081 Patent at 15:62–67; *see also* '830 Patent at 15:56–67 (similar). Claim 3 recites:

> 3.    The linear vibration module of claim 1 wherein the control component *receives output signals from sensors within the linear vibration module* during operation of the linear vibration module and adjusts one or more *operational control outputs* of the control component according to the received output signals from the sensors.

'081 Patent at 15:36–48 (emphasis added); *see also* '830 Patent at 16:14–19 (similar). Finally,

Claim 4 of each patents recites:

> 4.    The linear vibration module of claim 1 wherein the control component adjusts *the one or more operational control outputs of the control component according to the received output signals from the sensors* in order that subsequent operation of the linear vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters.

'081 Patent at 16:1–7 (emphasis added); *see also* '830 Patent at 16:21–27 (similar).

Neither Claim 1 refers to "one or more operational control outputs," but Claim 3 of each patent does. Resonant therefore asks the Court to judicially correct the dependency of Claim 4 to depend from Claim 3 rather than Claim 1. Resonant calls this a "one-character typographical error" that is "clear from the claim language." Dkt. No. 69 at 5. In response, Samsung disputes this is simply a one-character error and says there is reasonable debate as to how to resolve the dependency. Thus, says Samsung, judicial correction is inappropriate. Dkt. No. 102 at 3.

Resonant has the better position. As the Court previously wrote with respect to these patents and claims:

> Definiteness is always considered from the perspective of a skilled artisan. *See Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005) ("The perspective of a person of ordinary skill in the art at the time of the patent application governs the definiteness analysis."). Here, such a person would not think Claim 4 refers back to Claim 1. Most persuasively, Claim 4 references "the" control outputs, received output signals, and sensors, all of which are recited in Claim 3 but absent from Claim 1.
>
> Moreover, the nature of the narrowing from each patent's Claim 1 to Claim 4 bolsters Resonant's position. Specifically, Claim 1 expressly recites the structure of the invention, [and] Claim 3 recites how the "control component" of Claim 1 controls the supply of power to the driving component—by adjusting operational control outputs according to received output signals from sensors in the module. Claim 4 then recites the *result* of that "adjusting"—to "produce desired outputs from the one or more sensors." In other words, Claim 4 articulates the result of Claim 3, which, in turn, characterizes the operation of Claim 1's structure. Thus, reading these claims together, the Court concludes a skilled artisan would understand Claim 4 as limiting Claim 3 rather than Claim 1, and corrects each Claim 4 to depend from its respective Claim 3.

*Sony* Cl. Constr. Order, Dkt. No. 102-13 at 22.

Samsung's "reasonable debate" position centers on the phrase "the one or more sensors." It says Claim 4 as written lacks antecedent basis for four terms. Dkt. No. 102 at 3–4. And while correcting the dependency to Claim 3 would provide antecedent basis for three of them, Claim 4's

recitation of both "the sensors" and "the one or more sensors" suggests these phrases refer to different things. *Id.* at 5–6. For example, "the sensors" is plural and requires more than one, whereas "the one or more sensors" contemplates a single sensor. *Id.* at 5.

That argument is not persuasive. There's no reason a skilled artisan would think those two phrases refer to different things. The patents' only disclosure of "sensors" relates to Figure 6, which shows a sensor (632) connected to the CPU. The input signal "correspond[s] to the strength of the vibration currently being produced by the linearly oscillating mass 634." '081 Patent at 6:37–39. Claim 4 simply recites, in layman's terms, controlling the oscillating mass until it performs as desired.

"Correction is appropriate only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022) (cleaned up). "The error must be evident from the face of the patent, and the determination must be made from the point of view of one skilled in the art." *Id.* (cleaned up). Here, Samsung has not shown there is reasonable debate about how to correct what both parties agree is an error. Nor has Samsung shown Resonant's proposed construction is contrary to the prosecution history. Accordingly, the Court judicially corrects the dependency of Claim 4 to depend from Claim 3 rather than Claim 1.

### C. "driving component that drives the moveable component [in each of two opposite directions/to oscillate] within the housing" ('081 Patent, Claim 1; '830 Patent, Claim 1)

| Resonant's Construction | Samsung's Construction |
|---|---|
| Subject to 35 U.S.C. § 112 ¶ 6. <br><br> **Function:** driving the moveable component [in each of two opposite directions/to oscillate] within the housing | |
| **Structures:** One or more coils or electromagnets. E.g., '081 and '830 Patents, Figs 4A–4G (coil 420), Fig. 5A (coil 514), Fig. 6 (coil 626), electromagnet of Fig. 10, electromagnet of Fig. 11, Fig. 12 (coil 1206), Fig. 13 (first coil 1302 and second coil 1304), Fig. 14 (coils 1412 and 1414), Figs. 15, 16 (coil 1510), stator coils of Figures 24A, 24B, and 25; and equivalents thereof | **Structures:** One or more electromagnetic coils. E.g., '081 and '830 Patents, Figs 4A–4G (coil 420), Fig. 5A (coil 514), Fig. 6 (coil 626), electromagnet of Fig. 10, electromagnet of Fig. 11, Fig. 12 (coil 1206), Fig. 13 (first coil 1302 and second coil 1304), Fig. 14 (coils 1412 and 1414), Figs. 15, 16 (coil 1510), stator coils of Figures 24A, 24B, and 25 |

The parties agree this is a means-plus-function term and agree on the recited function, but disagree as to the proper corresponding structure. Resonant contends the corresponding structure includes "electromagnets," whereas Samsung says the corresponding structure must be limited to electromagnetic *coils*. Resonant's position is based partly on dependent Claim 8, which recites "the driving component is an electromagnetic coil." Dkt. No. 69 at 14. It reasons that if Claim 1 were limited to electromagnetic coils, Claim 8 would be superfluous. *Id.* Resonant also reasons that Samsung's position would exclude a preferred embodiment. *Id.* (citing '081 Patent at 15:1–5).

The Court agrees with Samsung for two reasons. First, any claim-differentiation argument doesn't change what structure the specification discloses. Here, because the "driving component" is a means-plus-function term, it is limited to the corresponding structure in the specification regardless of what any dependent claims recite. The Court is not aware of any case in which the

scope of the means-plus-function "structure" in an independent claim is affected by the scope of dependent claims. Here, that Claim 8 recites an electromagnetic coil does not change that the only disclosed "driving component" is an electromagnetic coil.

Second, Samsung's construction does not exclude a disclosed embodiment. The catch-all excerpt on which Resonant relies explains the components "can be fashioned from many different types of materials, from polymers and plastics to metals and alloys in various composite materials." '081 Patent at 15:1–5. While that might broaden the scope of any limitation directed to the components' composition, it does not amount to disclosure of corresponding structure for the "driving component."

Because the only disclosed structure are electromagnetic coils, the Court holds the corresponding structure is "one or more electromagnetic coils. E.g., '081 and '830 Patents, Figs 4A–4G (coil 420), Fig. 5A (coil 514), Fig. 6 (coil 626), electromagnet of Fig. 10, electromagnet of Fig. 11, Fig. 12 (coil 1206), Fig. 13 (first coil 1302 and second coil 1304), Fig. 14 (coils 1412 and 1414), Figs. 15, 16 (coil 1510), stator coils of Figures 24A, 24B, and 25; and equivalents thereof."

**D.    "control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values" ('830 Patent, Claim 1)**

| Resonant's Construction | Samsung's Construction |
|---|---|
| Subject to 35 U.S.C. § 112 ¶ 6.<br><br>**Function:** controlling supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values | |

| | |
|---|---|
| **Structure:** a microcontroller, a processor, a CPU, or a microprocessor contained within the vibrating module where the microcontroller, processor, CPU, or microprocessor are programmed with an algorithm comprising the following steps: (a) set the mode and strength to default values; and (b) provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component and equivalents thereof | **Structures:** a microcontroller, a processor, a microprocessor, or a CPU contained within the vibration module that performs the algorithm shown in Figure 7A excluding steps 710–712, and 718–724, with reference to all steps shown in Figure 7C, or the algorithm described in the corresponding text. *See, e.g.,* '830 Patent at 6:52–7:29, 7:31–7:34, 8:20–8:40, and equivalents thereof. |

The parties agree this is a means-plus-function term and agree on the recited function. They disagree as to the corresponding structure. Resonant proposes a 2-step algorithm that generally aligns with Figure 7C, whereas Samsung proposes the algorithm disclosed in Figure 7A, less some steps it says are not necessary to perform the claimed function. Samsung notes its proposed structure matches Judge Albright's construction in *Apple*. Dkt. No. 102 at 9.

The Court agrees with Samsung. The frequency control depends on expiration of a "frequency timer," which, in turn, depends on the current value of the variable *freq* shown in Figure 7A. When that timer expires, the algorithm changes the direction in the current applied to the coil by providing a control output to an H-bridge switch (FIG. 6, item 620). That reverses the direction of the magnetic field, which applies a force to the movable component in the opposite direction. '081 Patent at 7:13–18, fig.7A (items 706, 708).

Based on their proposed constructions, the parties agree the corresponding structure is a general-purpose processor programmed to execute some algorithm. Resonant's proposed structure, however, does not identify any part of an algorithm for performing the oscillation required by the recited function. At the hearing, Resonant mentioned the H-bridge switch as support for its construction, Hr'g Tr., Dkt. No. 111 at 21:5–15, but that strengthens Samsung's position, because the

CPU (602) *controls* the H-bridge switch "to rapidly alternate the direction of current within the coil." '081 Patent at 6:61–65. "When the frequency timer has expired, as determined in step 706, the value of the output signal is flipped, in step 708, and output to the H-bridge switch." *Id.* at 7:13–16. This shows that the corresponding structure refers to the algorithm of Figure 7A and must include steps 706 and 708. Resonant, on the other hand, points only to the steps of Figure 7C, which has nothing to do with the frequency of oscillation or the H-bridge switch.

At the hearing, Resonant made two other arguments against Samsung's construction. First, Resonant stressed that Samsung's position is inconsistent with its original claim-construction briefing and the position it took before the PTAB. *See generally* Hr'g Tr., Dkt. No. 111 at 11:17–15:18. But even if that's true, Resonant was unable to articulate a basis for why that requires the Court to reject Samsung's construction.

Second, Resonant suggested summarizing the steps of a disclosed algorithm was sufficient rather than requiring each step of that algorithm, especially when other steps of that algorithm aren't required to perform the recited function. *Id.* at 15:17–16:9. For support, Resonant cited *Univ. of Pitt. of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc*., 561 F. App'x 934 (Fed. Cir. 2014), in which "the parties disputed whether the disclosed structure was a computer processor programmed to perform a two-step algorithm as Pitt contended, or a thirty-step algorithm, as Varian contended," which was the complete algorithm disclosed by the specification. *Univ. of Pitt.*, 561 F. App'x at 938. The appellate court concluded "[t]he district court properly located the disclosure of [a 2-step] algorithm that covered what was necessary to perform the claimed function . . . and nothing more." *Id.* at 941.

That's what the Court does here. Although Resonant's argument suggests that Samsung's reference to Figure 7A is an improper attempt to narrow the claim scope by including unnecessary

steps, Samsung identifies the steps *necessary* to "cause the movable component to oscillate at a frequency and amplitude specified by one or more stored values," as recited in the claim. Step 702, for example, is the only disclosure of stored values on which frequency and amplitude can be based. And because step 708 must be included, the required algorithm must include step 704 to wait for the expiration of the frequency timer. Accordingly, Court holds the corresponding structure is "a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform steps 702, 704, 706, 708, 714, and 716 of Figure 7A and as shown in Figure 7C, and equivalents thereof."

> E.   **"control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features" ('081 Patent, Claim 1)**

| Resonant's Construction | Samsung's Construction |
|---|---|
| Subject to 35 U.S.C. § 112 ¶ 6. | |
| **Function:** controlling supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features | |
| **Structure:** a microcontroller, a processor, a CPU, or a microprocessor contained within the vibrating module where the microcontroller, processor, CPU, or microprocessor are programmed with an algorithm comprising the following steps: (a) set the mode and strength to values representing selections made by user input to the user input features; and (b) provide a corresponding output to the power supply so that the power supply provides a corresponding output to the driving component and equivalents thereof | **Structures:** a microcontroller, a processor, a microprocessor, or a CPU contained within the vibration module that performs the algorithm shown in Figure 7A excluding steps 718–724, with reference to all steps shown in Figure 7C, or the algorithm described in the corresponding text. See, e.g., '830 Patent at 6:42–7:24, 7:32–7:42, 7:50–8:30, and equivalents thereof. |

This dispute is like the "control component" dispute of Claim 1 of the '830 Patent, *see* Part IV.D, which is not surprising given the similarity of the claims. Resonant's proposed structure is

the same, but Samsung's is narrower and, relative to the prior term, requires Steps 710 and 712. Samsung says the patent discloses only one way to change the frequency variable, which is shown in steps 740, 744, 748, and 752. Dkt. No. 102 at 16.

The Court disagrees. The patent discloses that the frequency variable may be changed by user input. "When the frequency timer has expired, as determined in step 706, the value of the output signal d is flipped, in step 708, and output to the H-bridge switch, with the frequency timer being reset to trigger a next frequency-related event. The frequency-timer interval is determined *by the current value* of the variable freq." '081 Patent at 7:13–18 (emphasis added). This implies the current value could either be the default value set at start up in Step 702, or as later altered by user input. In contrast, Figure 7B is directed to a default mode in which the device "uses continuous feedback control to optimize the vibrational force produced by the [linear-resonant vibration module (LRVM)] by continuously seeking to operate the LRVM at a frequency as close as possible to [its] resonant frequency." *Id.* at 7:39–42.

The Court holds the corresponding structure is the same as for the previous term: "a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform steps 702, 704, 706, 708, 714, and 716 of Figure 7A and as shown in Figure 7C, and equivalents thereof."

F.    **"wherein the control component receives output signals from sensors within the [linear] vibration module during operation of the [linear] vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors" ('081 and '830 Patents, Claim 3)**

| Resonant's Construction | Samsung's Construction |
|---|---|
| Subject to 35 U.S.C. 112 ¶ 6. <br><br> **Function:** receiving output signals from sensors within the [linear] vibration module during operation of the [linear] vibration module and adjusting one or more operational control outputs of the control component according to the received output signals from the sensors | |
| **Structures:** No additional algorithmic structure beyond that of claim 1. Microprocessor or microcontroller 602; processor or CPU (*see, e.g.*, Fig. 7A steps 706, 708 and/or Fig. 7B steps 730, 736–754 and/or Fig. 7C Step 762); and equivalents thereof. | **Structure:** a microcontroller, a processor, a microprocessor, or a CPU contained within the vibration module that performs the algorithm shown in Figure 7A excluding steps 718–724, with reference to all steps shown in Figure 7B excluding Step 734, and all steps shown in Figure 7C, or the algorithm described in the corresponding text. *See, e.g.*, '830 Patent at 6:52–7:34, 7:42–52, 7:60–8:40, and equivalents thereof. |

The parties agree this is a means-plus-function term and agree on the recited function. Samsung proposes the same algorithm as it does for controlling the supply of power of Claim 1 of the '081 Patent. Resonant's proposed structure generally aligns with Samsung's, but Resonant's briefing characterizes the core dispute as to whether conversion to an integer is required. Dkt. No. 104 at 12. Resonant also says the recited function *is* the required algorithm. *Id.* at 11. Both sides seem to agree this requires the "monitor" routine disclosed as Figure 7B, although Samsung objects to the use of "e.g." and "and/or" in Resonant's proposed structure. Dkt. No. 102 at 21–22.

To start, Resonant's position is somewhat inconsistent. On one hand, Resonant concedes this is a means-plus-function term with a recited function of "receiving output signals from sensors . . . and adjusting one or more operational control outputs." But then Resonant says only those

"receiving" and "adjusting" steps are required. Dkt. No. 104 at 11; Hr'g Tr., Dkt. No. 111 at 29:21–30:19. In other words, in Resonant's view the function is also the algorithm. Despite that, Resonant nonetheless identifies steps from Figure 7B that it says satisfy the corresponding-structure requirement. Given that Resonant agrees this is a means-plus-function term and agrees on the recited function, the recited function cannot also be the disclosed algorithm. Otherwise, this would not be a means-plus-function term.

That said, the Court agrees with Resonant that Samsung's proposed structure is too inclusive. Figure 7B, which describes the steps of receiving the sensor input and adjusting operation control outputs, sets forth the only disclosed algorithm for the recited function. In step 730, the algorithm receives the sensor input and converts it to an integer and stores it as *lvl1*, the currently sensed vibrational strength. '081 Patent at 7:33–36. Steps 736, 738, 746, 742, and 750 are the decision-making logic, which generally involves comparing the stored integer value as *lvl0*, which is a *previously* sensed vibrational strength. Steps 740, 744, 748, and 752 show the adjusting of the control output. Figure 7C's steps are unrelated to the recited function.

Regarding Resonant's objection to the requirement of an integer, that is part of a required step of the disclosed algorithm and must therefore be included. Of course, whether converting sensor output to something other than an integer is a § 112 ¶ 6 "equivalent" is a different question. The Court holds the corresponding structure is "a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform the steps shown in Figure 7B except step 734, and equivalents thereof."

G. **"wherein the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the [linear] vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters" ('081 and '830 Patents, Claim 4)**

| Resonant's Construction | Samsung's Construction |
|---|---|
| Subject to 35 U.S.C. 112 ¶ 6. **Function:** adjusting the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the [linear] vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters | |
| **Structures:** microprocessor or microcontroller 602; processor or CPU (*see, e.g.*, Fig. 7A steps 706, 708 and/or Fig. 7B steps 730, 736-754 and/or Fig. 7C Step 762); and equivalents thereof. | **Structure:** A microcontroller, a processor, a microprocessor, or a CPU contained within the vibration module that performs the algorithm shown in Figure 7A excluding steps 718-724, with reference to all steps shown in Figure 7B excluding Step 734, and all steps shown in Figure 7C, or the algorithm described in the corresponding text. *See, e.g.*, '830 Patent at 6:52–7:34, 7:42–52, 7:60–8:40, and equivalents thereof. |

The parties agree the corresponding structure for this term is the same as the corresponding structure for Claim 3, although they disagree on what the structure is. For the same reasons set forth supra, the Court holds the corresponding structure is "a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform the steps shown in Figure 7B except step 734, and equivalents thereof."

H. **"wherein the one or more operational control parameters is a strength of vibration produced by the [linear] oscillation of the moveable component; and wherein the one or more operational control outputs is a frequency at which the control component drives the moveable component to [linearly] oscillate, the control component dynamically adjusting the power supplied to the driving component to produce [linear] oscillation of the movable component at a**

resonant frequency for the linear vibration module" ('081 and '830 Patents, Claim 5)

| Resonant's Construction | Samsung's Construction |
|---|---|
| Subject to 35 U.S.C. § 112 ¶ 6.<br><br>**Function:** dynamically adjusting the power supplied to the driving component to produce [linear] oscillation of the movable component at a resonant frequency for the [linear] vibration module<br><br>**Structures:** oscillator circuit; microcontroller with internal or external memory; processor; CPU; microprocessor; and equivalents thereof [if an algorithm is required] Where the corresponding structure is a processor, CPU, or microprocessor, the processor/CPU/microprocessor is programmed with an algorithm comprising the following steps: (a) if the frequency at which the device operates has been increasing and the vibrational force is greater than the previously sensed vibrational force, then increase the frequency—otherwise if the vibrational force is less than the previously sensed vibrational force, then decrease the frequency; and (b) if the frequency at which the device operates has not been increasing and the vibrational force is greater than the previously sensed vibrational force, then decrease the frequency—otherwise if the vibrational force is less than the previously sensed vibrational force, then increase the frequency<br><br>See, e.g., '081 patent at 7:38–42, 7:50–8:9, Fig. 7B; '830 patent at 7:48–52, 7:60-8:19, Fig. 7B | Subject to 35 U.S.C. 112 ¶ 6.<br><br>**Function:** Claim 4 function wherein the one or more operational control parameters is a strength of vibration produced by the [linear] oscillation of the moveable component; and wherein the one or more operational control outputs is a frequency at which the control component drives the moveable component to [linearly] oscillate, the control component dynamically adjusting the power supplied to the driving component to produce [linear] oscillation of the movable component at a resonant frequency for the [linear] vibration module<br><br>**Structures:** A microcontroller, a processor, a microprocessor, or a CPU contained `within the vibration module that performs the algorithm shown in Figure 7A excluding steps 718–724, with reference to all steps shown in Figure 7B excluding Step 734, and all steps shown in Figure 7C, or the algorithm described in the corresponding text. *See, e.g.*, '830 Patent at 6:52–7:34, 7:42–52, 7:60–8:40, and equivalents thereof. |

This claim limits "the one or more operational components" of Claim 4 to "a strength of vibration produced by the linear oscillation," and "the one or more operational control outputs" of Claim 4 to "a frequency at which the control component drives the movable component." '081

Patent at 16:12–14. These are the "operational control parameters" and "operational control outputs" disclosed by Figures 7B. Accordingly, the structure of the limitation is the same structure set forth *supra* for Claim 4: "a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform the steps shown in Figure 7B except step 734, and equivalents thereof."

I. **"wherein the one or more operational control parameters include both a strength of vibration produced by the linear oscillation of the moveable component and a current operational mode; and wherein the one or more operational control outputs is a control output that determines a current supplied by the power supply to the driving component and a frequency at which the control component drives the moveable component to [linearly] oscillate" ('081 and '830 Patents, Claim 6)**

| Resonant's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning; not subject to 35 U.S.C. § 112 ¶ 6; not indefinite.<br><br>If subject to 35 U.S.C. § 112 ¶ 6 and Samsung's function is accepted, then:<br><br>**Structures:** oscillator circuit; microcontroller with internal or external memory; processor; CPU; microprocessor; and equivalents thereof<br><br>[if an algorithm is required] Where the corresponding structure is a processor, CPU, or microprocessor, the processor/CPU/microprocessor is programmed with an algorithm comprising the following steps: (a) set the mode and strength to [default values or] values representing selections made by user input to the user input features; and (b) provide a corresponding output to the power supply so that the power supply provides a corresponding current to the driving component<br><br>'081 Patent at 7:10–24, 8:10–20, Figs. 7A, 7C; '830 Patent at 7:20–34, 8:20–30, Figs. 7A, 7C | Subject to 35 U.S.C. 112 ¶ 6.<br><br>**Function:** Claim 4 function wherein the one or more operational control parameters include both a strength of vibration produced by the [linear] oscillation of the moveable component and a current operational mode; and wherein the one or more operational control outputs is a control output that determines a current supplied by the power supply to the driving component and a frequency at which the control component drives the moveable component to [linearly] oscillate.<br><br>**Structure:** Indefinite. |

The parties dispute whether this is a means-plus-function term and, if it is, whether the specification provides any corresponding structure. Resonant says § 112 ¶ 6 does not apply because the claim "merely limits what the previously recited parameters and outputs can be—without modifying or adding to the function of claim 4." Dkt. No. 104 at 15. Alternatively, if this is a § 112 ¶ 6 term, Resonant advocates for the same structure it proposes for Claims 1 and 4. *Id.*

In response, Samsung says the patents only disclose adjusting the current based on user input—not based on sensor input—so there is no corresponding structure. Dkt. No. 102 at 30. Samsung alternatively argues that, if the claim is not indefinite, "one or more operational control outputs" includes two control outputs: "(1) a control output that determines a current supplied by the power supply to the driving component; and (2) a control output that is a frequency." *Id.* at 29. Samsung calls the claim language ambiguous as to whether it instead requires a single control output that determines both current and frequency. *Id.* But the specification, says Samsung, does not disclose such a "single control output." *Id.* In its reply, however, Resonant contests any ambiguity and says it would not make grammatical sense to require two separate control outputs given the claim language. Dkt. No. 104 at 15.

This is a means-plus-function term. More precisely, this claim incorporates and then narrows the means-plus-function terms of Claims 3 and 4 to specific operational control parameters and operational control outputs, including "a control output that determines a current supplied by the power supply." Thus, because Claim 4's single limitation is a means-plus-function term, Claim 6 includes that same limitation with a narrower function.

On the question of corresponding structure, Figure 7B is the only disclosure of adjusting a control output based on sensor signals as required by Claim 4 (and thus Claim 6), and that figure relates only to frequency. Resonant has not pointed to any algorithm for providing "a control output

that determines a current supplied by the power supply." Accordingly, because there is no disclosed

corresponding structure for this term, Claim 6 is indefinite.

## V.    CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "vibration module" ('081 and '830 Patents, Claims 1–8, 17) | "a device that can be incorporated into other devices or systems to provide vibrational forces" Emphasizes, plain meaning, confirmed by language in the spec and dictionary definitions. Also, distinguish our position in Sony |
| Typographical Error in Claim 4 | Claim 4 depends from Claim 3 |
| "driving component that drives the moveable component [in each of two opposite directions/to oscillate] within the housing" ('081 and '830 Patents, Claim 1) | Subject to 35 U.S.C. 112 ¶ 6 **Function:** driving the moveable component [in each of two opposite directions/to oscillate] within the housing **Structure:** One or more electromagnetic coils. E.g., '081 and '830 Patents, Figs 4A–4G (coil 420), Fig. 5A (coil 514), Fig. 6 (coil 626), electromagnet of Fig. 10, electromagnet of Fig. 11, Fig. 12 (coil 1206), Fig. 13 (first coil 1302 and second coil 1304), Fig. 14 (coils 1412 and 1414), Figs. 15, 16 (coil 1510), stator coils of Figures 24A, 24B, and 25; and equivalents thereof |
| "control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values" ('830 Patent, Claim 1) | Subject to 35 U.S.C. 112 ¶ 6 **Function:** controlling supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by one or more stored values **Structure:** a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform steps 702. 704, 706, 708, 714 and 716 of Figure 7A and as shown in Figure 7C, and equivalents thereof |

| | |
|---|---|
| "control component that controls supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features"<br><br>('081 Patent, Claim 1) | Subject to 35 U.S.C. 112 ¶ 6<br><br>**Function:** controlling supply of power from the power supply to the driving component to cause the moveable component to oscillate at a frequency and an amplitude specified by user input received from the user-input features, and equivalents thereof<br><br>**Structure:** a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module  programmed to perform steps 702, 704, 706, 708, 714 and 716 of Figure 7A and as shown in Figure 7C, and equivalents thereof |
| "wherein the control component receives output signals from sensors within the [linear] vibration module during operation of the [linear] vibration module and adjusts one or more operational control outputs of the control component according to the received output signals from the sensors"<br><br>('081 and '830 Patents, Claim 3) | Subject to 35 U.S.C. § 112 ¶ 6.<br><br>**Function:** receiving output signals from sensors within the [linear] vibration module during operation of the [linear] vibration module and adjusting one or more operational control outputs of the control component according to the received output signals from the sensors<br><br>**Structure:** a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform the steps shown in Figure 7B except step 734, and equivalents thereof |
| "wherein the control component adjusts the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the [linear] vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters"<br><br>('081 and '830 Patents, Claim 4) | Subject to 35 U.S.C. § 112 ¶ 6.<br><br>**Function:** adjusting the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the [linear] vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters<br><br>**Structure:** a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform the steps shown in Figure 7B except step 734, and equivalents thereof |

| | |
|---|---|
| "wherein the one or more operational control parameters is a strength of vibration produced by the [linear] oscillation of the moveable component; and wherein the one or more operational control outputs is a frequency at which the control component drives the moveable component to [linearly] oscillate, the control component dynamically adjusting the power supplied to the driving component to produce [linear] oscillation of the movable component at a resonant frequency for the linear vibration module"<br><br>('081 and '830 Patents, Claim 5) | Subject to 35 U.S.C. § 112 ¶ 6.<br><br>**Function:** adjusting the one or more operational control outputs of the control component according to the received output signals from the sensors in order that subsequent operation of the [linear] vibration module produces desired outputs from the one or more sensors corresponding to one or more operational control parameters, wherein the one or more operational control parameters is a strength of vibration produced by the [linear] oscillation of the moveable component; and wherein the one or more operational control outputs is a frequency at which the control component drives the moveable component to [linearly] oscillate, the control component dynamically adjusting the power supplied to the driving component to produce [linear] oscillation of the movable component at a resonant frequency for the linear vibration module"<br><br>**Structure:** a microcontroller, processor, a CPU, or a microprocessor contained within the vibration module programmed to perform the steps shown in Figure 7B except step 734, and equivalents thereof |
| "wherein the one or more operational control parameters include both a strength of vibration produced by the linear oscillation of the moveable component and a current operational mode; and wherein the one or more operational control outputs is a control output that determines a current supplied by the power supply to the driving component and a frequency at which the control component drives the moveable component to [linearly] oscillate"<br><br>('081 and '830 Patents, Claim 6) | Subject to 35 U.S.C. § 112 ¶ 6.<br><br>**Function**: Claim 4 function wherein the one or more operational control parameters include both a strength of vibration produced by the [linear] oscillation of the moveable component and a current operational mode; and wherein the one or more operational control outputs is a control output that determines a current supplied by the power supply to the driving component and a frequency at which the control component drives the moveable component to [linearly] oscillate.<br><br>**Structure:** Indefinite. |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the

parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 19th day of August, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE